**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AETNA, INC.,

Plaintiff,

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN,

Defendant.
_______________________________________/

Case No. 11-15346

HON. DENISE PAGE HOOD

**ORDER DENYING MOTIONS TO EXCLUDE EXPERT TESTIMONY OF DR. GUSTAVO BAMBERGER**

## I. BACKGROUND

Defendant Blue Cross Blue Shield of Michigan ("Blue Cross") seeks to exclude Plaintiff Aetna, Inc.'s ("Aetna's") damages expert, Dr. Gustavo Bamberger, from presenting his testimony at trial. Supplemental briefs were filed as to Dr. Bamberger's testimony after further discovery was held by the parties. Aetna filed responses to the motions and Blue Cross filed replies.

Aetna filed a two-count Complaint against Blue Cross alleging: Unlawful Agreement in Violation of Sherman Act § 1 (Count One); and, Violation of M.C.L. § 445.772, Michigan Antitrust Reform Act (Count Two). Aetna alleges that Blue Cross, the dominant provider of health insurance and administrative services to managed care plans in Michigan, has implemented a scheme to use ever-increasing

premiums from the patients and employers it serves in order to protect its dominant position and thwart competition from Aetna and other competitors. (Comp., ¶ 1) Aetna claims that Blue Cross has entered into exclusionary contracts with hospitals under which it agreed to pay hospitals more money if the hospitals increased the rates they demanded to treat patients covered by its competitors' health plans. (*Id.*)

## II. ANALYSIS

### A. Standard of Review

Rule 702 of the Rules of Evidence governs the admissibility of expert testimony. The trial court must determine whether the expert meets three requirements: 1) that the witness must be qualified by "knowledge, skill, experience, training or education;" 2) the proffered testimony is relevant and "will assist the trier of fact to understand the evidence or to determine a fact in issue;" and, 3) the testimony is reliable in that it is based on scientific, technical or other specialized knowledge. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008). As to the third requirement, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court set forth factors to be considered in determining whether to admit expert testimony as reliable. The four factors are: 1) whether a theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication;

3) the known or potential rate of error in using a particular and scientific technique and the existence and maintenance of standards controlling the technique's operation; and 4) whether the theory or technique has been generally accepted in the particular scientific field. *Id.* at 593-94. The factors are neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The factors will often be appropriate in determining reliability. *Id.* at 152. The trial court has broad latitude to determine whether these factors are reasonable measures of reliability in a particular case. *Id.* at 153. The test of reliability is "flexible," and the *Daubert* factors do not constitute a definitive checklist or test and may not be dispositive in every case. *In re Scrap Metal*, 527 F.3d at 529. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997).

**B. Dr. Gustavo Bamberger (Damages Expert)**

**1. Qualification and Relevance**

Blue Cross does not seek to exclude Dr. Bamberger's testimony based on qualification or relevance. Dr. Bamberger graduated from the University of Chicago

Graduate School of Business with an M.B.A. and a Ph.D. He has published on antitrust matters and has over two decades of experience in applying economic analyses to legal and regulatory issues before courts and agencies. Dr. Bamberger's testimony is relevant to Aetna's alleged damages involving exclusionary contracts.

**2. Reliability**

Based on the three statement of issues raised by Blue Cross in its motion, Blue Cross is seeking to exclude Dr. Bamberger's testimony that Aetna suffered more than $363 million in damages. Blue Cross argues that Dr. Bamberger's conclusion is based on: 1) projections that are fundamentally flawed, inconsistent with actual data and rejected by Aetna; 2) damages that are unreliable and speculative based on extrapolations for many years into the future and Aetna admits that the projections more than three years into the future are speculative; and, 3) the opinion is based on incorrect assumptions about the conclusions of Aetna's liability expert, fails to measure the damages actually caused, and fails to measure Aetna's but-for costs, prices and margins, which Blue Cross claims are necessary components of any damages model. In its supplemental brief, Blue Cross argues that Dr. Bamberger's model must be excluded because it is an "all or nothing" model that cannot measure the relationship between the alleged illegal conduct and the alleged damages. Blue Cross also argues that Dr. Bamberger now admits that he does not rely on Dr.

Vellturo's causation analysis and that he did not conduct his own causation analysis. Blue Cross claims that based on this admission, Dr. Bamberger's damages model is "untethered" to Aetna's liability theory and must be excluded.

**a. 2005 Data**

Blue Cross asserts that Dr. Bamberger testimony, based on Aetna's 2005 projection data, which Aetna has since rejected, is unreliable. Aetna had purchased the Preferred Provider Network of Midwest ("PPOM") rental network to access PPOM's lower hospital and physician rates in Michigan. PPOM was used by Aetna's competitors, including United and Humana. Blue Cross claims that, in 2007, Aetna negotiated decreases in its rates with hospitals while agreeing to raise reimbursement rates for PPOM customers. Blue Cross asserts this was intended to weaken Aetna's non-Blue Cross competitors and caused customers to leave PPOM, and Aetna renaming the company as "Cofinity." Blue Cross claims that Aetna's 2005 projections were based on PPOM's 2004 projections under its pre-acquisition business model and did not account for the drastic changes Aetna made to PPOM and abandonment of its brand. Blue Cross asserts that Aetna achieved its hospital reimbursement rates in its 2005 projections, but the profits failed to meet its 2005 projections. Blue Cross claims that because its 2005 projections did not predict its real world experience, Aetna, in 2007, reduced dramatically its projected earnings.

Blue Cross argues that when Dr. Bamberger performed his analysis in 2012, Aetna not only had actual membership data for the entire period covered by the 2005 projections, but also had knowledge that in 2007 Aetna rejected the 2005 projections.

Aetna responds noting Blue Cross also recognizes in its brief, that experts routinely rely on ordinary-course business projections to construct the but-for world in their damages model. Aetna asserts that its 2005 projections are well within the realm of permissible sources for constructing a but-for world free of Blue Cross' exclusionary conduct. Aetna claims the 2005 projections were based on analysis by business experts in each relevant business unit who used extensive information from various sources, including third-party data and consultant's reports, and that the process lasted several months. The projections were based on realistic and conservative projections. Aetna's reliance on the 2005 projections before it purchased PPOM and invested $390 million was tested and validated through multiple acquisitions. Aetna claims the 2005 projections were the result of a thorough and detailed process developed by subject matter experts. Aetna states that Dr. Bamberger did not simply take Aetna's ordinary course projections and rely on them blindly, but he conducted a thorough investigation of the processes and methodology underlying the projections, including a detailed review of relevant documents and numerous conversations with the individuals who developed the projections. (Bamberger

Report, ¶ 20 & n. 46) As to using actual data from 2005-2007 or Aetna's revised projections, Aetna claims that Dr. Bamberger did use Aetna's actual data to check the reliability of the projections and he found that Aetna met and exceeded its projections prior to the challenged conduct by Blue Cross. (Bamberger Report, ¶11) Aetna argues that this bolsters the reliability of the 2005 projections.

The Sixth Circuit has held that evidence of lost profits based on marketing forecasts prepared well before litigation as anticipated by employees specializing in economic forecasting was a proper basis for a jury's damages award. *Upjohn Co. v. Rachelle Labs, Inc.*, 661 F.2d 1105, 1114 (6th Cir. 1981). In anti-trust cases, damages can never be shown with mathematical precision. *See Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.*, 346 F.2d 661, 666 (6th Cir. 1965). The measure of damages to a plaintiff in anti-trust cases is uncertain because of "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). An anti-trust plaintiff is not limited to damages which the plaintiff can prove with reasonable certainty, but the trier of fact may make a just and reasonable estimate based on relevant data and may act on probable and inferential proof. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002).

In this case, Blue Cross does not challenge that the 2005 projections were based on rigorous analysis by experts in the various business units. Dr. Bamberger relied on this data, but tested the data by comparing it to the actual 2005-2007 data and by discussing the data with those that prepared the projections. As noted by Dr. Bamberger, the best source to analyze the likely growth of Aetna's business in the but-for Blue Cross' actions, is to use Aetna's pre-acquisition projections, before the initiation of Blue Cross' contracting program. (Bamberger Report, ¶ 19) Blue Cross' argument that the projections should be based from mid-2007, when Blue Cross was already in the process of implementing its anticompetitive contracts, would not reflect a but-for world, absent Blue Cross' alleged anticompetitive actions. Any challenge to the 2005 projections by Blue Cross, or Aetna's modification of its projections in 2007 based on actual data, may be made by Blue Cross through cross-examination.

**b. Speculative Extrapolation**

Blue Cross argues that Dr. Bamberger's projection of lost profits nine years into the future is speculative in that Aetna has not made any business projections greater than three years.

Aetna responds that the furthest Dr. Bamberger projected damages in any market segment is about six years after the then-scheduled trial date of April 2014. Aetna claims that Blue Cross' claim that Aetna only projects three years out and so

damages should be capped at three years is not supported by any case law. Aetna asserts Dr. Bamberger did not just "make up" his projections, but his projections were based on reasonable and conservative assumptions based on his investigations analyzing Aetna's business projections and interviewing Aetna's business leaders.

Expert testimony providing long-term projections of lost profits has been allowed by courts. *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 765 (6th Cir. 1985). The proper method of valuation goes to weight, not admissibility of the evidence. *Id.* In this case, Dr. Bamberger's long-term projections were based on assumptions he made from available information from Aetna and after analyzing the data. Blue Cross can test Dr. Bamberger's assumptions through cross-examination. The jury may accept or disregard Dr. Bamberger's projections as to lost profit.

**c. Improper Assumptions, Methodology and Testimony**

Blue Cross argues that Dr. Bamberger's damages testimony based on the assumption that if Aetna had better hospital rates it would have met the projections made in 2005, based on the testimony of Aetna's liability expert, Dr. Christopher Vellturo, is improper because Blue Cross claims Dr. Vellturo did not so testify.

In response, Aetna agreed Dr. Bamberger testified that without the anticompetitive actions Aetna "may" have had more profits and members more in line with the 2005 projections. Aetna argues that Dr. Bamberger's projections are

nevertheless proper and are based on the 2005 projections prior to the litigation at issue. Aetna claims any damages testimony would presume that Aetna would prevail on its liability claim as is ordinary and proper for a damages expert, therefore Dr. Bamberger did not duplicate Dr. Vellturo's analysis relating to the liability elements of Aetna's claim. Dr. Bamberger testified that he did not include as an input into his damages model any numerical figures from Der. Vellturo's analysis, which Aetna claims is not unusual or unreliable.

Damages testimony may be admissible if the testimony offered is a reliable and useful measure of the extent of the injuries suffered as a result of a defendant's alleged unlawful conduct and not upon the quality of plaintiff's proofs on the issue of liability. *In re Northwest Airlines Corp. Antitrust Litig.,* 197 F. Supp. 2d 908, 926 (E.D. Mich. 2001). If Aetna prevails on the liability issue, Dr. Bamberger's testimony offered by Aetna would be relevant and useful to the trier of fact as noted above. Any challenge to whether Dr. Bamberger properly relied on the liability expert's report may be raised on cross-examination.

The methodology issue and Dr. Bamberger's reliance on Aetna's 2005 projections have been addressed above and any deposition testimony by Dr. Bamberger that Blue Cross challenges may also be raised on cross-examination. The underlying expert report is sufficiently reliable.

**d. Supplemental Report / "All or Nothing" Model**

Blue Cross notes that Aetna challenges 67 separate and distinct contracts containing MFN clauses. If some of the MFNs are found to be legal or not to have caused Aetna to pay higher hospital prices, Dr. Bamberger's model cannot incorporate this finding according to Blue Cross. Blue Cross claims that Dr. Bamberger's supplemental report is an "all or nothing" model which cannot be adjusted for any contrary facts about the actual harm or the lack of such harm Aetna suffered from the MFNs. Blue Cross asserts that Dr. Bamberger's opinion is that the amount of damages at $363 million would not change since the model cannot separate damages caused by legal conduct from damages caused by illegal conduct. Blue Cross claims that Bamberger did not attempt to estimate what portion of the harm, if any, occurred at hospitals with differential MFN clauses, hospitals with equal-to MFN clauses, or hospitals without MFN clauses. Blue Cross asserts that Dr. Bamberger's solution would be simply to attribute all damages to whatever conduct the jury happened to find illegal. Blue Cross argues that such a damages model is completely divorced from the harm and is therefore unreliable. Blue Cross claims that Dr. Bamberger's "aggregate" model does not take into account any customer-by-customer analysis and did not even look at large specific customers. Blue Cross argues that Dr. Bamberger's model is not adjusted for events that cannot possibly be related to MFNs.

Aetna responds that Blue Cross fundamentally mischaracterizes Dr. Bamberger's damages model in an effort to claim that he has not measured the impact of the unlawful conduct. Aetna claims that Dr. Bamberger used a standard economic analysis to isolate and measure the effect of the challenged conduct–Blue Cross' MFNs. Aetna claims that Dr. Bamberger's model measured the impact of the challenged conduct. He testified repeatedly, which Aetna claims Blue Cross ignores, that his model is not indifferent to the actual impact of Blue Cross' MFNs. Aetna claims that Dr. Bamberger's analysis was based on what the actual rate gap was, not Blue Cross' hypothetical other rate gaps. Contrary to Blue Cross' claim, Aetna asserts that Dr. Bamberger employed a well-established methodology for isolating and estimating damages flowing from the challenged conduct. Aetna further asserts that Dr. Bamberger adjusted for all factors other than the challenged contracts, which allowed him to estimate the impact of those contracts. In other words, Aetna argues that the but-for world differs from the actual world only in that the MFN contracts did not exist in the but-for world. Aetna asserts that the difference between the but-for and actual worlds measures the impact of those contracts. Aetna claims that the Federal Judicial Center's Reference Manual on Scientific Evidence affirms this standard of methodology. Fed. Jud. Center, Ref. Man. on Sci. Evid. 432 (3d ed. 2011). Aetna asserts that Dr. Bamberger's but-for world isolates the impact of the

MFN contracts and controls for all factors unrelated to the challenged conduct. Aetna claims there is no disconnect between its liability theory and Dr. Bamberger's damage model. Aetna argues that Dr. Bamberger's model translated the legal theory of the harmful event into an analysis of the economic impact of that event. As to Blue Cross' argument that the damages calculation must be a customer-by-customer analysis, Aetna argues that there is no such authority and that the exactness of such a model is not required. Aetna claims Blue Cross has failed to identify any new facts that required another adjustment to Dr. Bamberger's model. Aetna argues that any fact Dr. Bamberger failed to consider goes to the accuracy of the conclusions and not to the reliability of the testimony.

The Court finds that Dr. Bamberger's model and analysis is reliable. Blue Cross may not agree with the conclusions and it may so challenge such on cross-examination. Since damages need not be determined with mathematical certainty, the Court finds that Dr. Bamberger's failure to conduct a customer-by-customer calculation of damages does not go to the reliability of the model used. Blue Cross may challenge Dr. Bamberger's calculations and his reasons for using such during cross-examination. Blue Cross may also challenge the conclusions of Dr. Bamberger's but-for world analysis which the Court finds reliable. Blue Cross' challenges to Dr. Bamberger's analysis go to weight, not reliability. The Court denies

Blue Cross' Motions to exclude the Expert Testimony of Dr. Gustavo Bamberger.

## III. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the Defendant Blue Cross' Motions to Exclude Expert Testimony of Dr. Gustavo Bamberger **(Doc. Nos. 261 and 395)** are DENIED.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED: March 31, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2015, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager